1

2

3

4

5

6

7

8                    IN THE UNITED STATES DISTRICT COURT

9                  FOR THE EASTERN DISTRICT OF CALIFORNIA

10   RUDY JAMES MURPHY,

11            Petitioner,                No. CIV S-03-1046 FCD GGH P

12        vs.

13   A. A. LAMARQUE, Warden,

14            Respondent.              FINDINGS & RECOMMENDATIONS

15   _____/

16   I.  Introduction

17            Petitioner is a state prisoner proceeding through counsel with a petition for writ of

18   habeas corpus.  Petitioner challenges his 1998 conviction on charges of first degree murder with

19   special circumstances (Cal. Pen. Code §§ 187, 190.2(a)(17)(A)) and robbery (Cal. Pen. Code §

20   211).  Petitioner is serving a sentence of life without parole.

21            This action is proceeding on the second amended petition filed October 12, 2004.

22   Petitioner claims that the state trial court violated his federal constitutional rights pursuant to the

23   Fifth, Sixth and Fourteenth Amendments when it excused a sitting juror.

24            After carefully considering the record, the court recommends that the petition be

25   denied.

26   /////

1

II.  Anti-Terrorism and Effective Death Penalty Act (AEDPA)

The AEDPA applies to this petition for habeas corpus which was filed after the AEDPA became effective.  Neelley v. Nagle, 138 F.3d 917 (11th Cir. 1998) (citing Lindh v. Murphy, 117 S. Ct. 2059 (1997)).   The AEDPA "worked substantial changes to the law of habeas corpus," establishing more deferential standards of review to be used by a federal habeas court in assessing a state court's adjudication of a criminal defendant's claims of constitutional error.  Moore v. Calderon, 108 F.3d 261, 263 (9th Cir. 1997).

In Williams (Terry) v. Taylor, 529 U.S. 362, 120 S. Ct. 1495 (2000), the Supreme Court defined the operative review standard set forth in § 2254(d).  Justice O'Connor's opinion for Section II of the opinion constitutes the majority opinion of the court.  There is a dichotomy between "contrary to" clearly established law as enunciated by the Supreme Court, and an "unreasonable application of" that law.  Id. at 1519.  "Contrary to" clearly established law applies to two situations:  (1) where the state court legal conclusion is opposite that of the Supreme Court on a point of law, or (2) if the state court case is materially indistinguishable from a Supreme Court case, i.e., on point factually, yet the legal result is opposite.

"Unreasonable application" of established law, on the other hand, applies to mixed questions of law and fact; that is, the application of law to fact where there are no factually on point Supreme Court cases which mandate the result for the precise factual scenario at issue.  Williams (Terry), 529 U.S. at 407-08, 120 S. Ct. at 1520-1521 (2000).  It is this prong of the AEDPA standard of review which directs deference to be paid to state court decisions.  While the deference is not blindly automatic, "the most important point is that an unreasonable application of federal law is different from an incorrect application of law....[A] federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly.  Rather, that application must also be unreasonable."  Williams (Terry), 529 U.S. at 410-11, 120 S. Ct. at 1522 (emphasis in original).  The habeas corpus petitioner bears the burden of demonstrating the

1  objectively unreasonable nature of the state court decision in light of controlling Supreme Court

2  authority.  Woodford v. Viscotti, 537 U.S. 19, 123 S. Ct. 357 (2002).

3         The state courts need not have cited to federal authority, or even have indicated

4  awareness of federal authority in arriving at their decision.  Early v. Packer, 537 U.S. 3, 123 S.

5  Ct. 362 (2002).  Nevertheless, the state decision cannot be rejected unless the decision itself is

6  contrary to, or an unreasonable application of, established Supreme Court authority.  Id.  An

7  unreasonable error is one in excess of even a reviewing court's perception that "clear error" has

8  occurred.  Lockyer v. Andrade, 538 U.S. 63, 75-76, 123 S. Ct. 1166, 1175 (2003).  Moreover, the

9  established Supreme Court authority reviewed must be a pronouncement on constitutional

10 principles, or other controlling federal law, as opposed to a pronouncement of statutes or rules

11 binding only on federal courts.  Early v. Packer, 123 S. Ct. at 366.

12        However, where the state courts have not addressed the constitutional issue in

13 dispute in any reasoned opinion, the federal court will independently review the record in

14 adjudication of that issue.  "Independent review of the record is not de novo review of the

15 constitutional issue, but rather, the only method by which we can determine whether a silent state

16 court decision is objectively unreasonable."  Himes v. Thompson, 336 F.3d 848, 853 (9th Cir.

17 2003).

18 III.  Background

19        The opinion of the California Court of Appeal contains a factual summary.  After

20 independently reviewing the record, the court finds this summary to be accurate and adopts it

21 below.

22        Rosslyn Foote checked into the Rolling Green Motel with a county
          housing voucher.  She was accompanied by her boyfriend (Tommie
23        Bishop) and her sister, Melissa.  They met Jeffrey Stetka, who was
          staying in a nearby room, and spent some time with him.
24
          Defendant and his friend, Aaron Fulgham, came to the motel and
25        visited Rosslyn and Tommie.  The four of them went to Stetka's
          room while Stetka and Melissa were out.  Defendant and Fulgham
26        searched through Stetka's belongings and took some clothing.

Rosslyn admitted taking a pair of socks.  Defendant and Fulgham found a container with bullets in it, and searched unsuccessfully for a gun.

Later that evening, Stetka joined everyone in Rosslyn's room; people drank and smoked methamphetamine.  Stetka became very intoxicated and went back to his room.  Defendant, Fulgham and Melissa discussed where Stetka's gun might be and how to find it. Melissa said Stetka usually kept his door open and had valuables in his room.  Defendant suggested going to Stetka's room and tying him up with a telephone cord.  Rosslyn told them not to do it and became very upset.  She went to Stetka's room to try to persuade him to leave, but Stetka was lying on the bed and would not get up.

Crying, Rosslyn left the motel with Tommie.

Melissa went to Stetka's room to be sure he was asleep and to leave the door open for defendant and Fulgham.  Defendant and Fulgham then went into Stetka's room.  When Melissa joined them there a few minutes later, she saw Fulgham removing a knife from Stetka's body.  Stetka died from multiple stab wounds.

Defendant, Fulgham and Melissa took various items from Stetka's room, including sports jerseys, binoculars, and a VCR.  They returned to Rosslyn's room, wiped the room down, and collected evidence linking them to the scene, which they put in a pillowcase and threw into a nearby dumpster.

The three then drove to the home of a friend, Charlotte Steel, picking up Rosslyn and Tommie on the way.  When they arrived at Steele's house, defendant and Fulgham sold some of the items they had taken from Stetka's room, including the binoculars and half a carton of cigarettes.

Defendant, Fulgham, and Melissa also went to the home of Fulgham's girlfriend.  They showed her some of the sports jerseys and caps they had taken from Stetka and laughed about them.  At one point, defendant said he had taken a jersey from "some kid that was passed out."  Defendant appeared nervous and wanted to know what had been reported on the television news.

Defendant and Fulgham were charged with the robbery and the murder of Jeffrey Stetka, and were tried jointly.  Melissa was granted immunity and testified in detail about the events surrounding Stetka's death.  Rosslyn also testified.  She admitted taking a pair of socks during the first search of Stetka's room, and she also admitted later taking the carton of cigarettes from Charlotte's house.

/////

4

1  The jury convicted defendant of both robbery and first degree
   murder with a robbery special circumstance.[1]  The court sentenced
2  defendant to life without possibility of parole, and this appeal
   followed.
3

4  (Respondent's Answer, Ex. D at 2-4, as modified by Order Modifying Opinion and Denying

5  Rehearing, filed as Ex. E to Respondent's Answer.)

6  IV.  Discussion

7           Petitioner's sole claim is that the trial court violated his Fifth and Fourteenth

8  Amendment right to due process and his Sixth Amendment right to trial by jury and a unanimous

9  verdict when it excused a sitting juror who believed that the prosecution had not proved an

10 essential element of its case beyond a reasonable doubt.  Petitioner raised this claim for the first

11 time on direct appeal.  (Answer, Ex. B.)  The California Court of Appeal denied the claim in a

12 reasoned decision dated April 24, 2001, as modified by order dated May 23, 2001.  (Answer,

13 Exs. D, E.)  Petitioner subsequently raised the claim in a petition for review to the California

14 Supreme Court.  (Answer, Ex. F.)  That petition was summarily denied by order filed August 8,

15 2001.[2]

16          On approximately October 16, 2003, petitioner filed a petition for a writ of habeas

17 corpus in the California Supreme Court.  (Exhibit, State Exhaustion Petition, filed November 10,

18 2005.)  Therein, petitioner raised the following two claims: (1) that the trial court prejudicially

19 _____

20     [1]  The jury convicted codefendant Aaron Fulgham of the same offenses and also found he
   used a knife in the commission of these crimes.  We affirmed this conviction in an earlier
21 nonpublished opinion.  (People v. Fulgham (Feb. 29, 2000, C030529).)

22      A petition for review was filed in Fulgham and the Supreme Court placed the case on
   "grant and hold" status, pending its decisions in People v. Metters (1998) 62 [sic] Cal.App.4th
23 1489, review granted June 10, 1998, No. S069442, and People v. Cleveland (2001) 87
   Cal.App.4th 263, review granted June 30, 21999 [sic], No. S078537.  Our reliance on Fulgham is
24 therefore limited to a recitation of facts common to both cases.  (As discussed later in our
   opinion, People v. Cleveland (May 7, 2001, S078537) ___ Cal.4th ___ [2001 D.A.R. 4377], was
25 decided the day (May 7, 2001) defendant filed his petition for rehearing with this court.)

26     [2]  Justice Kennard was of the opinion that the petition should be granted.

                                          5

1  denied petitioner's Fifth, Sixth and Fourteenth Amendment right to trial by jury and to due

2  process when it excused a sitting juror who continued to believe that the prosecution had not

3  proved an essential element of its case beyond a reasonable doubt; and (2) that petitioner was

4  deprived of the effective assistance of counsel when his appellate counsel failed to raise the issue

5  that the trial judge coerced a verdict and deprived petitioner of a fair trial when he refused to

6  grant petitioner's motion for a mistrial after the trial court's overly intrusive inquiry into the

7  jury's deliberative process.  (Id.)  By order dated September 1, 2004, the California Supreme

8  Court denied the petition, as follows: "Petition for writ of habeas corpus denied.  (See *In re Clark*

9  (1993) 5 Cal.4th 750 [21 Cal.Rptr.2d 509, 855 P.2d 729]; *In re Robbins* (1998) 18 Cal.4th 770,

10  780 [77 Cal.Rptr.2d 153, 959 P.2d 311]).)" (Exhibit, California Supreme Court Decision of

11  9/1/2004, filed November 10, 2005.)

12      The California Supreme Court issued a summary denial of the claim petitioner

13  raises in the instant petition the first time it was raised in that court.  Although the state supreme

14  court determined that the claim was procedurally barred the second time it was raised in habeas,

15  respondent correctly does not rely upon procedural bar in that the first review on the merits by

16  the California Supreme Court is not negated simply because petitioner "exhausted too much," i.e.

17  filed a duplicative claim in habeas corpus.  Therefore, this court reaches the merits of the claim.

18      In reviewing a state court's summary denial of a habeas petition, the court "looks

19  through" the summary disposition to the last reasoned decision.  Shackleford v. Hubbard, 234

20  F.3d 1072, 1079 n.2 (9th Cir. 2000) (citing Ylst v. Nunnemaker, 501 U.S. 797, 803-04, 111 S.

21  Ct. 2590 (1991)).  Accordingly, this court will "look through" the summary dispositions to the

22  reasoned decision of the California Court of Appeal to determine whether the adjudication of

23  petitioner's claim in state court was contrary to or an unreasonable application of clearly

24  established Supreme Court authority.  28 U.S.C. § 2254(d)

25  \\\\\

26  \\\\\

1   1. <u>Facts</u>

2   The background facts relevant to petitioner's claim are the following.  Petitioner's

3   jury began deliberating on Tuesday, April 21, 1998.  (Clerk's Transcript on Appeal (CT) at 443.)

4   The next day, at 10:00 a.m., the jury sent a note which read as follows: "We are at an impass

5   [sic] and require further instructions."  (<u>Id.</u> at 445; Reporter's Transcript on Appeal (RT) at

6   2352.)  In response to this note, the court called the jurors into the courtroom in order to clarify

7   the nature of their concerns.  (RT at 2352-53.)  The court asked Juror No. 9 to describe the nature

8   of the impasse.  (<u>Id.</u> at 2354.)  Juror No. 9 stated that the court had given adequate instructions

9   but that the jury was unable to reach an agreement.  (<u>Id.</u>)  He agreed with the trial judge that the

10  impasse was "more in the nature of a disagreement, a lack of unanimity on some of the

11  evidentiary issues."  (<u>Id.</u> at 2354-55.)  The court next interviewed Juror No. 1, who stated that the

12  jury had "conflicting issues as far as what is reasonable doubt and what's not."  (<u>Id.</u> at 2355.)

13  The trial judge concluded that further instruction was unnecessary, made some suggestions

14  regarding ways to move beyond the impasse, and sent the jurors out for further deliberation.  (<u>Id.</u>

15  at 2355-5.)

16  At noon the next day, the jurors sent the following note: "After another day and a

17  half, we are unable to come to a unanimous vote."  (RT at 2361; CT at 447.)  When the bailiff

18  retrieved the note from the jurors to deliver to the judge, Juror No.1 and Juror No. 2 asked

19  whether they could talk to the trial judge, and another juror (Juror No. 4) indicated under his

20  breath that he also wished to speak to the judge.  (RT at 2361-62.)  Over the objections of

21  counsel for petitioner and co-defendant Fulgham, the court decided to question these three jurors

22  individually, outside the presence of the other jurors.  (<u>Id.</u> at 2362-63.)

23  Juror No. 2 stated that he felt the court's "orders" were not being followed or that

24  "there is an open mind."  (<u>Id.</u> at 2364.)  He stated that one of the jurors, who was later identified

25  as Juror No. 11 (see <u>id.</u> at 2388), did not have an open mind "from day one;" did not wish to

26  discuss anything with the other jurors, and told another juror he "was going to find out a possible

7

way to get off [the jury] because he's frustrated and aggravated and he don't feel that he should have to be here and take this and not willing whatsoever to be open minded about anything." (Id. at 2365, 2378.) Juror No. 11 had also stated several times the previous day that he was not going to show up the next day. (Id. at 2366.) Juror No. 2 stated that the other jurors had attempted to have an open discussion with Juror No. 11 but that he had "not really" interacted with other members of the jury to discuss the evidence. (Id. at 2367.) When other jurors tried to engage Juror No. 11 or asked questions about his view of the evidence, he just responded, "I don't know" or "could be." (Id.) Juror No. 2 stated that Juror No. 11 was "pretty much just set in his mind and not willing to hear or listen to anything that was presented." (Id. at 2368.) Juror No. 2 stated that he had had concerns about Juror No. 11's deliberations or open-mindedness "from day one." (Id.) He further stated that Juror no. 11 had made up his mind and refused to change it, and that he "didn't want to be open-minded or hear anything." (Id.) According to Juror No. 2, Juror No. 11 stated that he didn't "feel that there is . . . enough evidence there." (Id. at 2369.) Juror No. 2 and the other jurors didn't believe that Juror No. 11 was following the instructions. (Id. at 2370.) He agreed that Juror No. 11 had "shown up after each break." (Id.) However, he stated that from the first day of deliberations, Juror No. 11 was "not really giving us any answers that we ask him or we need from him" and that he "does not give a direct answer to anything." (Id.) Juror No. 2 stated that in answer to questions put to him, Juror No. 11 would respond, "I'm not sure, I don't know, could be, nothing direct to answer any of our questions." (Id. at 2371.) Juror No. 11 did not refuse to answer questions or refuse to interact, but he didn't "give [the jurors] any answers to what we ask." (Id. at 2371-72.)

When asked whether there was any particular instruction that Juror No. 11 had been ignoring or disregarding, Juror No. 2 responded, "evidence." (Id. at 2372-73.) Immediately after deliberations began, Juror No. 11 told the other jurors "how he felt and that his opinion wasn't gonna change." (Id. at 2373.) The other jurors had tried to interact with Juror No. 11 but "he's just not willing to do it." (Id. at 2373.) Juror No. 2 did not believe that Juror No. 11 was

going to "participate" because he had stated that "his mind is set." (Id. at 2374.) Upon further questioning, Juror No. 2 stated that, in an attempt to get the discussions moving, the foreperson had suggested that Juror No. 11 write down "what you feel is there, what isn't there pertaining to the evidence in the case." (Id. at 2375.) Although Juror No. 11 wrote down "a couple" of things, the jury "couldn't even get past the first one with even a direct answer." (Id. at 2377.) With respect to the first item Juror No. 11 wrote down, he explained it "somewhat, but still not to [the other jurors'] satisfaction." (Id. at 2377.) Finally, Juror No. 2 stated that "evidence in general, he's just not looking and seeing, or wanting to see, anything. He's just got a very closed mind on everything." (Id. at 2378.)

The court next interviewed Juror No. 1. (Id. at 2379.) Juror No. 1 told the trial judge that Juror No. 11 "has flat out said that he's not going to argue with us. He doesn't feel that he has to explain anything to us. And if he does explain something, he doesn't want to repeat it twice." (Id. at 2379.) Juror No. 11 informed Juror No. 1 several times that he didn't "want to be here," that he "didn't ask to be here," and that he was "thinking about just not showing up." (Id. at 2380, 2384.) Juror No. 11 was "refusing to speak or to voice his opinion." (Id.) Juror No. 1 asked Juror No. 11 if he was refusing to deliberate, and Juror No. 11 responded, "I'm not going to argue." (Id. at 2381.) Juror No. 1 explained that there was a lot of "frustration" among the jurors because of the situation with Juror No. 11. (Id. at 2381-82.)

Juror No. 1 explained that the jurors were focusing on the jury instructions because a lot of jurors felt Juror No. 11 was not taking the instructions into consideration. (Id. at 2382.) According to Juror No. 1, Juror No. 11 was not focusing on the evidence received during trial, as instructed, but was focusing on things that were "irrelevant to the reality of what's going on and what the charges and the case in front of us" and was "questioning people and things that have nothing to do." (Id. at 2383.) Juror No. 11 was focusing on "things that aren't evidence and the character of people who weren't even on the witness stand that aren't defendants, weren't on the witness stand, weren't involved." (Id.) If the other jurors asked Juror No. 11 to talk about

the evidence or his view of the evidence, he would respond that he didn't want to be there.  (Id. at 2384.)  Juror No. 11 had been acting in this manner "as soon as everyone's opinion started coming out."  (Id.)  Juror No. 11 "kind of closed off" and his body language indicated that he was not willing to participate.  (Id. at 2384-85.)  For instance, Juror No. 11 did not look at anyone, he crossed his arms, and he turned his chair so he was "off to the other side."  (Id. at 2385.)  At the other jurors' request, Juror No. 1 mentioned to Juror No. 11 that he was not following the law because he appeared to be basing his opinion on matters not in evidence.  (Id. at 2387.)  Juror No. 11 responded that he was "entitled to his personal opinion."  (Id. at 2387.)

The trial judge next questioned Juror No. 4.  Juror No. 4 stated that he thought the deliberating process "has been okay.  I don't have a problem with what we are trying to do."  (Id. at 2390.)  He answered in the affirmative, however, when the judge asked whether he disagreed with the standards by which Juror No. 11 was evaluating the case.  (Id. at 2391.)  He explained:

> The concern is in the area of reason, that the Court's instructions talk about taking everything that has been presented and using reason in trying to decide whether there is probability or no probability.
>
> And it seems that that rule is being taken to the far extreme, that rather than looking for reasonable inference from what has been given, that 100 percent absolutely perfect facts and evidence need to be in place rather than being able to use some reasonable inference.

(Id. at 2391.)  Juror No. 4 stated that Juror No. 11 said that "what's necessary to make a decision, is absolute 100 percent perfect factual information and reasonable doesn't come into play."  (Id.)  He also stated that Juror No. 11 had a "bias towards one of the witnesses."  (Id. at 2392.)

The trial judge next questioned Juror No. 9, the jury foreperson.  Juror No. 9 stated that he felt there were "parties present within our panel" who were not willing to participate in the "deliberation process."  (Id. at 2394.)  The court asked Juror No. 9 whether the court's instructions to the effect that the jury has a "duty to deliberate, to discuss openly the evidence presented here in court, follow the law, consider only evidence that was received in this

trial" had been followed.  (Id. at 2395.)  Juror No. 9 responded, "No, I do not."  (Id.)  He further

elaborated, as follows:

> We've read through, again, the instructions and the law to look at
> the evidence as it is presented, not lack of evidence or evidence
> that has not been presented.
>
> And that seems to be a particular bias in this case to where
> decisions are being made on evidence that isn't there rather than
> evidence that is there.

(Id. at 2396.)  He stated that he had discussed "multiple times" with Juror No. 11 that the jury

"must rely solely on the evidence introduced at trial."  (Id.)  Juror No. 11 responded that

"information that . . . should have been . . . given to the Court or brought in as evidence was not

there."  (Id.)  Juror No. 9 stated that Juror No. 11 appeared to be making decisions based not on

the evidence that was presented at trial, but on "unanswered questions" or "that had there been

other evidence presented to this particular person's satisfaction, that they would be able to make

a decision based on that particular evidence, not that evidence that was already presented in this

case."  (Id. at 2396-97.)  He further explained that "there was not sufficient evidence to this

party's satisfaction to be able to answer beyond a reasonable doubt what was the particular

verdict."  (Id. at 2397.)  Juror No. 9 summarized Juror No. 11's position as follows: "A decision

is made.  It cannot be changed no matter what you say.   The evidence that they're looking for is

not there.  And being the fact that all the evidence has been shown, it's not going to be there, and

therefore their decision is made."  (Id. at 2398.)

Juror No. 9 agreed that there was "interaction about all the different points that

were raised," but that Juror No. 11 always believed that evidence was "lacking."  (Id. at 2398.)

He agreed that Juror No. 11 "did discuss with you openly their views of the evidence and their

evaluation of the case."  (Id.) Juror No. 9 also explained that Juror No. 11 was biased towards

certain testimony and that his bias was not "within the lawful factors set forward in the

instructions for evaluating evidence."  (Id. at 2399.)

\\\\\

1       At this point, counsel for petitioner's co-defendant argued that it appeared Juror

2   No. 11 had deliberated and formed an "individual opinion" and that there was no evidence of

3   juror misconduct and no need to replace Juror No. 11.  (Id. at 2400.)  The court decided,

4   however, to question Juror No. 11 individually.  (Id.)

5       During his interview, Juror No. 11 stated that he had heard all of the evidence and

6   all of the testimony.  (Id. at 2401.)  He stated that he had "come to a conclusion, and I'm not

7   gonna – we've argued for three days, and I don't believe that there is anything to change my

8   mind."  (Id.)  After being informed by the judge that the jurors had a duty to engage in

9   deliberations and "meaningfully deliberate," Juror No. 11 responded that he had "been

10  bombarded, I've been belittled, I've been insulted.  And me defending my view, I think that I am

11  past the point of listening anymore."  (Id. at 2402.)  When asked by the judge whether he would

12  listen to the other jurors and convey his own views, Juror No. 11 responded that "I have no

13  choice to listen.  I don't see me changing."  (Id.)  When asked whether he had stated that he

14  might not return to the court, Juror No. 11 responded that he had "made the comment that I don't

15  feel like coming back."  (Id. at 2403.)  When asked whether he would return to deliberate if

16  directed to do so, Juror No. 11 stated that he would.  (Id. at 2404.)  When asked whether he

17  would engage in deliberations with the jurors if directed to do so, he responded, "I can sit and

18  listen."  (Id.)  When asked whether he would discuss the evidence and the law, Juror No. 11

19  responded that "we have discussed all of the evidence and the law that pertains to this case."

20  (Id.)  The judge then asked, "if I directed the jury to continue to deliberate, would you discuss the

21  facts and the law, the evidence received in this trial and the law with them?"  (Id.)  Juror No. 11

22  responded, "I don't know" and clarified that "we've been doing it for three days, and there is

23  nothing new."  (Id.)  Juror No. 11 expressed his belief that he had had "an open mind" at the

24  beginning of deliberations and that he had engaged in give and take with the other jurors,

25  explained his viewpoint, and listened to their viewpoint, but that they didn't listen.  (Id. at 2405.)

26  When asked whether everyone had a chance to air their views of the evidence and to evaluate the

law, Juror No. 11 stated, "many times over." (Id.) Juror No. 11 stated that one of the jurors had

told him that he wasn't following the instructions, and he responded that he thought he was

following the instructions. (Id. at 2406.)

At the conclusion of these interviews, petitioner's counsel moved for a mistrial.

(Id. at 2407.) Counsel argued that it appeared the jury was at an impasse after three days of

deliberations and that Juror No. 11 had simply formed an early opinion that was not going to

change. (Id. at 2407-09.) Counsel for petitioner's co-defendant joined in the motion, arguing

that the problem appeared to be "a failure of proof," and "that is a hung jury." (Id. at 2409.) The

trial judge stated that she believed a ruling on whether to dismiss Juror No. 11 was "premature"

and that she was concerned about whether Juror No. 11 was biased against any of the witnesses.

(Id. at 2413.) The court denied the motion for mistrial and proceeded to conduct an inquiry into

juror bias.

The next day, the prosecutor filed a motion to dismiss Juror No. 11. (Id. at 2415.)

The trial court did not immediately rule on this motion, but proceeded to question the jurors on

the issue of whether Juror No. 11 harbored a bias against any witnesses that was affecting the

deliberations. (Id. at 2415-16.)

The trial judge first questioned Juror No. 4. (Id. at 2421.) She asked this juror to

describe the nature of the bias that had been exhibited during the course of deliberations. (Id. at

2421.) Juror No. 4 stated that Juror No. 11 had a bias against a particular witness. (Id.)

Specifically, Juror No. 4 stated, "because of one thing that one person said, one witness said, if it

was somebody else that said the same thing and all the evidence was exactly the same, no less, no

more, it would change this person's mind." (Id. at 2421-22.) Juror No. 4 stated that the bias was

based "on the type of person the witness was" and "the lifestyle of certain witnesses that would

be most likely different than ours." (Id. at 2422, 2423.) Specifically, he explained that Juror No.

\\\\\

\\\\\

13

11 did not believe the statements of Melissa because she was "on drugs." (Id. at 2424.)[3]  As a result, Juror No. 4 was led "to believe that evidence didn't mean anything to this person, it's just the person that made the statement" and that Juror No. 11 was "so completely bias [sic] that he could not make a fair decision." (Id. at 2424, 2425.)

After the interview with Juror No. 4, the prosecutor expressed his opinion that further inquiry was futile because the type of bias described by Juror No. 4 was not improper. (Id. at 2425.)  The trial court agreed that "it doesn't sound like an impermissible bias based on what he's just said." (Id.)  Counsel for petitioner's co-defendant argued that if the court was inclined to dismiss Juror No. 11, the court should continue to make inquiry of the remaining jurors. (Id. at 2426.)  The court decided to engage in additional juror interviews "to give us information as to whether (Juror Number 11) has, in fact, engaged in meaningful deliberation and whether he has had an open mind from the outset or has, as some jurors have felt, not had an open mind." (Id. at 2429.)  The judge explained that "the question is has he really meaningfully deliberated at all, thus rendering unlawful deliberations." (Id. at 2430.)

The court next interviewed Juror No. 3.  (Id. at 2435.)  Juror No. 3 stated that the jurors "got into a big discussion" about "relying on the evidence that was there and not relying on – coming to an opinion because of the fact that there wasn't something there that you expected should have been there." (Id. at 2437.)  Without specifying any particular juror, Juror No. 3 stated that "they" were "always going to this aspect of what wasn't there and – rather than just dealing with what was there in the way of evidence." (Id. at 2438.)  Juror No. 3 stated that this juror "couldn't come up with the reasons why, you know, just say, that's just what I think, and pretty much intractable." (Id.)  Juror No. 3 believed that "things have come to a point where – where I would say a considerable number have closed down and have kind of exhausted

---

[3]  As described above, Melissa Foote was granted use immunity for her testimony for the prosecution. (CT at 440.)  This situation was the subject of several jury questions on the first day of deliberations. (Id. at 439-42.)

whatever thoughts they had and what approaches they can think of to take." (Id. at 7439.)  The

trial judge asked Juror No. 3 the following question: "You know the other day, the first time the

jury sent me a note and I brought you all in here and I said, you know, go on out there and try

some different things and talk with one another and remember the instructions, when I sent you

all back out to do that, did everyone at that point continue to meaningfully talk with one another

about the evidence?" (Id. at 2439-40.)  Juror No. 3 responded, "Oh, yes, definitely yes.  None of

them have ever been backward about saying what they thought." (Id. at 2440.)

        The trial court next questioned Juror No. 5.  (Id.)  When asked by the trial judge

whether the jurors had all engaged in deliberations mindful of the jury instructions regarding the

jurors' duty to deliberate with an open mind and to fully discuss and evaluate the evidence in the

case, Juror No. 5 responded, "no." (Id. at 2441.)  Juror No. 5 stated that "we have been informed

by somebody they already had their mind made up before they entered.  And it has been

expressed to myself, um, that, um, deliberation would not be possible." (Id.)  Juror No. 5 stated

that he had asked Juror No. 11 on the morning of the third day of deliberations whether he was

willing to deliberate with the other jurors, and he said "no, he would not deliberate." (Id. at

2441, 2442, 2448.)  Juror No. 5 asked the other jurors to witness this answer.  (Id. at 2442.)  The

other jurors asked Juror No. 11 why he wouldn't deliberate and he shrugged and said "no." (Id.

at 2442-43.)  Juror No. 5 asked Juror No. 11 several times whether he would deliberate, and

Juror No. 11 would "shrug his shoulders and say nothing." (Id. at 2449.)  Juror No. 5 had

concerns about the willingness of Juror No. 11 to deliberate "from day one" because "he

expressed that he wouldn't change his mind, he had already made up his mind." (Id. at 2444-45.)

He told the judge that the other jurors tried to explain to Juror No. 11 that "the things he was

saying and doing were not instructed by you and he was disregarding most, if not all, of your

instructions." (Id. at 2445.)  In addition, Juror No. 11's body language indicated that he was

refusing to participate.  Juror No. 5 described this body language as "cross[ing] his legs and arms

and, you know, almost a physical barrier and continuous shrugging of the shoulders and refusal

1    to answer questions." (Id.)

2          According to Juror No. 5, Juror No. 11 commented on the competence of the

3    various attorneys and appeared to focus on the attorneys themselves and not on the evidence. (Id.

4    at 2445.)  Juror No. 11 stated that it was "unfair" that the prosecutor was a better attorney than

5    petitioner's counsel. (Id. at 2446.)  Juror No. 5 stated that "the rest of the jury deliberated

6    amongst themselves.  And every time they tried to deliberate with this person, um, he would

7    shrug his shoulders." (Id. at 2446.)  Juror No. 5 also stated that Juror No. 11 "put a witness on

8    trial." (Id.)  Juror No. 5 noticed that most of these problems started "early day two" of the

9    deliberations. (Id. at 2447-48.)  Juror No. 5 did not believe that Juror No. 11 was "following the

10   law" regarding the duty to deliberate. (Id. at 2449.)  This belief started "approximately 15

11   minutes after we entered the deliberation room on day one." (Id. at 2450.)  At that time, Juror

12   No. 11 pointed to the jurors and said, "I can't believe all of you." (Id.)  Juror No. 5 further

13   explained, "I asked him to relay his opposing thoughts to me, and they were giving their

14   thoughts.  And he would not give his – he didn't say anything.  He said very little, shrugged his

15   shoulders a lot.  His physical – I can't put his physical expressions in words, a lot of "I don't

16   know's," "I won't say." (Id. at 2453.)

17         The court next questioned Juror No. 6.  Juror No. 6 stated that he believed the

18   jurors were doing their best to "follow the procedures," but that "not everyone is in agreement of

19   – of what the evidence and facts and law is." (Id. at 2455.)  When asked whether all of the jurors

20   were able to talk about their views and engage in a discussion so that they could consider and

21   evaluate the case, Juror No. 6 responded "no." (Id.)  He explained that Juror No. 11 stated, at the

22   end of the first day of deliberations, "I have an opinion, I'm not gonna change it.  And no matter

23   what you say, I'm not gonna change it unless you can bring new evidence or new material.  I said

24   what I said." (Id.)  Juror No. 6 stated that after the judge sent the jurors back to the jury room

25   after their first note, the jurors "engaged in discussion but not with an open mind." (Id. at 2456.)

26   Specifically, Juror No. 11 stated, "I've already given my opinion.  And no matter what you say,

that's my opinion." (Id. at 2457.)  When asked to explain his position in this regard, Juror No. 11 stated, "the evidence is not enough and there is no – there is no receptiveness in discussing the evidence because in that juror's mind it's not enough so what there is doesn't count." (Id. at 2457.)  Juror No. 6 did not believe that Juror No. 11 was following the "legal standards and guidelines" given by the trial judge. (Id.)  However, Juror No. 11 felt that he was following the instructions and the law. (Id.)  Juror No. 6 believed that Juror No. 11 was overly sensitive and that he took the arguments of other jurors as a personal attack. (Id. at 2458.)

The court next interviewed Juror No. 7. (Id. at 2459.)  Juror No. 7 stated that shortly after deliberations began on the second day, Juror No. 11 stated that his mind was made up and "nothing anyone could say could change that opinion." (Id. at 2460.)  When the other jurors attempted to ascertain why Juror No. 11 "wasn't being open" and "wasn't willing to listen," Juror No. 11 would "shut down" and stated, "he wasn't on trial here, and he didn't have to answer our questions." (Id. at 2461.)  If he did answer any questions, his response would usually be "I don't know" or "I'm not on trial." (Id.)  Juror No. 11 expressed his belief that he didn't have to justify his actions and that the other jurors "were trying to get him just to deliberate with us." (Id. at 2462.)  Juror No. 7 stated that Juror No. 11 had a "big problem with one of the witnesses" because of "drugs." (Id. at 2462, 2464.)  When the other jurors reminded Juror No. 11 that they had all agreed that they could "set aside those biases" when evaluating the credibility of witnesses, Juror No. 11 stated, "well, not all of us said we could." (Id. at 2463-2465.)  Juror No. 7 did not believe that Juror No. 11 ever had an open mind, even on the first day of deliberations. (Id. at 2466.)  From the very beginning of deliberations, Juror No. 11 would not respond to questions, or would respond by saying "he did not have to answer that, or I don't know . . . he would mention that he wasn't the one that was on trial." (Id. at 2467.)  Juror No. 7 stated that "anything that came from [Juror No. 11] had to be dragged out of him, had to be – there was just nothing – he wouldn't – he wasn't participating." (Id.)

\\\\\\

1    The trial judge next interviewed Juror No. 8.  (<u>Id.</u> at 2468.)  Juror No. 8 believed

2   that Juror No. 11 was violating the instruction that the jurors "are supposed to deliberate the

3   evidence of the trial as it was presented to us and not postulate other possibilities of what could

4   have happened."  (<u>Id.</u> at 2469.)  He did not feel that Juror No. 11 was engaging in "open

5   negotiations regarding positions."  (<u>Id.</u> at 2470.)  On the first day of deliberations, Juror No. 11

6   told Juror No. 8 that he didn't believe the evidence presented during the prosecution's case was

7   credible and that it "didn't warrant further consideration."  (<u>Id.</u> at 2471-72.)  Juror No. 8 felt that

8   there was no "meaningful discussion" with Juror No. 11 because "his mind was made up, and he

9   was unwilling to discuss his position with us."  (<u>Id.</u> at 2472.)  He explained that the other jurors

10  tried to assess the evidence presented at trial, but they "couldn't get past the beginning."  (<u>Id.</u>)

11  Juror No. 8 stated that on the second day of deliberations, after the trial judge sent the jury back

12  for deliberations, "the deliberation was even more intense" than it was during the first day of

13  deliberations because Juror No. 11's "position was exactly the same as it was when he went in."

14  (<u>Id.</u> at 2473.)  When the other jurors asked Juror No. 11 to explain or rationalize his position,

15  they "got nothing but a silence."  (<u>Id.</u> at 2473-74.)  That was happening "from day one."  (<u>Id.</u> at

16  2474.)

17      The trial court next questioned Juror No. 10.  (<u>Id.</u> at 2475.)  Juror No. 10 stated

18  that the deliberations had not been conducted "with an open mind" because "someone had made

19  a decision, and that was it."  (<u>Id.</u> at 2475-76.)  He stated, "[d]ecisions had been made before they

20  even walked in the door, I think."  (<u>Id.</u> at 2476.)  When asked why he had that impression, Juror

21  No. 10 stated, "a very closed off feeling, not open to any type of suggestion and not even trying

22  to convince someone else to see their side."  (<u>Id.</u>)  His impression in this regard was caused by

23  "mainly body language."  (<u>Id.</u>)  Juror No. 10 stated that it was "like pulling teeth" and that it was

24  "very difficult" to discuss the evidence with Juror No. 11.  (<u>Id.</u>)  Juror No. 10 did not believe that

25  Juror No. 11 was "following instructions" because he was "looking for something that's not

26  there."  (<u>Id.</u> at 2477.)  He believed that Juror No. 11 had made a decision from the very

1   beginning.  (Id. at 2478.)  His impression was based on "body language and about the way this

2   person interacted," but was not based on anything specific Juror No. 11 said.  (Id.)  Juror No. 10

3   described the body language of Juror No. 11 as "just sitting there very closed off, arms crossed,

4   legs crossed . . . when someone was speaking, looking almost through them, not really at them or

5   even away from them."  (Id. at 2479.)

6           The final juror interviewed was Juror No. 12.  (Id. at 2479.)  When asked whether

7   all of the jurors had followed the instructions in their deliberations, he stated, "to the most part,

8   yes."  (Id. at 2480.)  Although he believed that "most of" the jurors had been following the

9   instructions, there were "varying opinions."  (Id. at 2481.)  He believed that the jurors were

10   "doing an honorably good job given the circumstance that we're all under."  (Id. at 2481.)  He

11   stated, "there's none of us that, I think, are comfortable with that to begin with, but we're all

12   doing it."  (Id.)

13           2.  Trial Court's Decision

14           At the conclusion of the juror interviews described above, the trial judge heard

15   argument on the prosecution motion to dismiss Juror No. 11 and a defense motion for mistrial

16   based on a hung jury.  The court then issued the following ruling:

17           It is my view, and I'm very mindfull [sic] of the competing
            interests in making a decision on this issue.  Jurors are absolutely
18           entitled to form their own opinions of the evidence, it is expected
            that they will do so.  It is understood that they will not always agree
19           with one another about that evidence.

20           It is recognized that, quite honestly, these opinions may be stated
            quite early on in the deliberative process.  However, it is also
21           important and crucial that these opinions be based on the evidence
            and the law; and, further, that the jurors engage in open discussions
22           regarding the reasons behind their opinions.  This is the nature of
            the deliberative process and it is essential to a meaningful
23           deliberation.

24           In my view, in this case that has failed to occur.  And the reasons
            for this are as follows in summary:
25
            I find that (Juror 11) has failed to approach deliberations with an
26           open mind;

                                                    19

I further find that he has failed to follow the instructions of the Court by referring to and relying on matters that are not in evidence;

I find that he did not have an open mind regarding the credibility of witnesses.

And I also find that he has quite profoundly failed to engage in any meaningful deliberations with the other Jurors; and, also, but very important, has effectively refused to continue to deliberate with the other jurors.

Regarding these findings, I'll just expand on them briefly.  Uhm, I have incorporated the testimony – or the statements of the Jurors in making these findings.

But with respect to Finding Number 1, that is based on the reports of a number of Jurors who have conveyed, using different language, that (Juror 11) conveyed to them in both word and body language quite early on that he did not have an open mind, that his mind-set was described as being closed or set from day one, and that he stated strong opinions early on in the process.

I should state that this finding is a significant finding, but I find more important some of my subsequent findings.

Jurors reported as to Finding Number 2, and I do believe, that (Juror 11) was not relying on information properly before the Jury. And some of these statements and concerns were conveyed to the Court in a very generalized way, but a number of Jurors related to the Court the concern that he was not following instruction.

And when asked the particular instruction, they referred to the fact that he was not relying on the evidence.

(Juror 1) was a little more specific in stating that he relied on people – the character of people who were not in trial, who were not witnesses and were not parties to the case.

Furthermore, (Juror 5) conveyed he even injected the personality of counsel, representatives of the parties as a part of his discussion on the merits of the case which is totally in (sic) appropriate.

The third finding is not one based on extensive examination and, in fact, my view in this is fairly limited because there's fairly limited information.  But several jurors did explain that in their view they felt (Juror 11) expressed a bias.  To the extend (sic) to which we conducted any investigation, the jurors felt this bias was most likely an attitude toward people who use drugs or have a different lifestyle.

I do feel that some interesting information was gleaned from this inquiry.  In particular, I recognize that the lifestyles and drug use and drug abuse of the participants in this case were evidence that this jury could consider and rely on.  Certainly, the jury could – jurors could differ in the weight that they give these factors; and certainly a juror could reasonably disbelieve a juror based on some of these factors.

I will state that I'm particularly troubled in this subject area based on this testimony of (Juror 7) who relates a very specific statement of (Juror 11).  (Juror 7) recounted to the Court a discussion and a reference to the fact this attitude about the lifestyles and drug use of individuals was discussed, to use these words.  But clearly in the voir dire of the Jury panel and her recollection was that the jurors had committed to having an open mind and relying on the evidence presented.

Now I think it's one thing all together for (Juror 11) to have a different opinion as (Juror 7), he certainly may well have had a legitimate difference of opinion in this area.  But I find his statement reaches a certain level of gainsmanship (sic) and, quite honestly, dishonesty when in response to her statement that they took an oath as jurors to have an open mind and rely on the evidence, he replied something to the effect "not all of us did."

She was clearly troubled by this, remembered it specifically.  And it does stand out in my mind as conveying a very troubling attitude of (Juror 11).

So I recognize that the information in this area is very limited.  But to the extent there's information, I'm very troubled by (Juror 11)'s own comment regarding his own state of mind.

The most compelling factor that I've considered in the last two factors, many are that (Juror 11) has failed to engage in any meaningfull (sic) deliberations with any of the other jurors.

I recognize the Defense has argued and it's their position that (Juror 11) has deliberated, he has discussed the case, and he simply has reached a differing conclusion.  And he has an absolute right to do so.

Quite honestly, one of the reasons that I felt that further inquiry was warranted, not because there isn't any question in my mind about the credibility of the jurors that had spoken, but rather that if there was any chance that jurors were trying to oust (Juror 11) based on his viewpoint.  I wanted to get to the bottom of that, I wanted to see if that in fact was being revealed by them.

\\\\\

In my view, the contrary was shown by their statements.  When taken as a whole, they were strikingly similar in describing, in different ways, the profound refusal of (Juror 11) to really discuss the case and discuss his opinion.

I'm making the finding that (Juror 11) has failed to engage in deliberations.  I realize this refusal can take many forms, and there are in fact several ways in which (Juror 11) manifested his refusal to participate.

First of all, he effectively refused to meaningfully interact with other jurors by repeated engaging in indirect or nonresponsive answers.

A number of the jurors related the following: I don't know, could be, I didn't ask to be here, I'm not sure.  Answers such as these cannot possibly be considered to be meaningful responses in light of the requirement that he discuss the basis for his opinion as well as the (sic) listen to the opinions of other jurors and visa-versa.

Secondly, (Juror 11) outright refused to answer some of the direct questions posed to him by the jury regarding his opinion of the evidence.

Now not all jurors remember this, but I think it's reasonable: Several of the jurors who remember asking him specific questions in particular remember him not giving an answer; that this is the type of thing that would stand out in your mind and clearly did stand out in the mind of these jurors when it did happen.

He also demonstrated by his conduct and demeanor that he did not desire to participate.  A number of jurors described a very distinct physical posture that he maintained which was described as closed, it was also physically described by the jurors as crossed arms, crossed legs, turning away, not looking at the jury.

His own statements also – Category Number 4, by his statements, he indicated he didn't want to participate.  He has said to different people in different ways: I didn't ask to be here, I don't want to be here.  One juror reported he said he was going to try to get off of the Jury, maybe he won't come back, he didn't want to come back.

Those – any one of those statements on an isolated basis might be one thing, but the repetition of these statements and in context with all these others, clearly demonstrates the state of mind of a juror that does, in fact, not want to be here in my view.

And then lastly, when specifically asked by other jurors will you deliberate – several jurors recall just directly asking him at different points including Day One also on Day Two of deliberations, will you deliberate.  And these jurors report either he

22

did not answer directly, he answered no, or gave some other nonresponsive reply.  By his own response, he's told these other jurors, in essence, he would not deliberate.

His conduct in my view undermines the jurors' attempts to engage in any kind of deliberations.

I also find in evaluating the juror's (sic) themselves, there's no evidence that they did in fact badger (Juror 11) or engage in any improper tactics that might be considered coercive or inappropriate.

It appears they have made considerable efforts to try to engage him in a discussion of the case, quite admirable efforts in my view, and through various means he resisted and thwarted efforts of the jury.

Lastly is the issue of whether (Juror 11) will if required or directed to to engage in the future in any meaningful deliberations.

Now, clearly, (Juror 11) did not ask to be excused, he didn't refuse to return to court, he didn't answer no when I asked him that question outright.  However, the nature of the manner of his responses left no doubt in my mind that he will not engage in any discussions of the case or the evidence with the jurors.

He's conveyed to the Court his feeling that he has already done so. I disbelieve that.  And I will say that at times there was certainly an occasion when – the Court Reporter's transcript is inadequate to really record the manner and demeanor which a person presents themselves here in court.  (Juror 11)'s posture and his conduct in the manner of his response so closely mirrored that description given by many jurors, it was startling.  He did not answer questions directly, he assumed a posture and the nature described by the jurors.  He engaged in lengthy pauses after each Court's question so much so that quite honestly were he here as a witness, I would have at that point actually ordered him or directed him to respond.

So while he had indicated a willingness to return and a willingness to be present, anything beyond that he certainly did not commit to. If anything, he conveyed quite clearly to me that he was not going to engage in any real discussion that could be considered meaningful with the jurors if he were ordered to return.

Therefore, I do find that his failure to deliberate in any meaningful way with the Jury up to this point constitutes a failure to perform his duties as a juror.  And that his refusal to commit to engage in further deliberations leaves me with no choice but to find good cause to dismiss him from this jury.

And that is my order, I'm granting the People's Motion.

1          To the extent that there is a Motion For a Mistrial, I will simply
           state: Based on these findings, I do not feel the Jury has had an
2          opportunity to engage in meaningful deliberations and therefore
           such a course of action is premature at this point.

3

4    (RT at 2511-18.)

5          After the dismissal of Juror 11, the court chose Alternate 3 to round out the 12

6    person jury, RT 2527, and deliberations started anew.  The jury later came to a unanimous

7    verdict.

8                3.  Opinion of the California Court of Appeal

9          The California Court of Appeal denied petitioner's challenge to the trial court's

10   dismissal of Juror No. 11 with the following reasoning:

11         Defendant asserts Juror No. 11's dismissal was not supported by
           good cause.  He contends Juror No. 11 did not fail to deliberate,
12         but instead weighed the evidence and simply came to a conclusion
           different from that of the other jurors.  We do not agree.
13
           The California Supreme Court recently reaffirmed this standard in
14         People v. Cleveland, supra, ___ Cal.4th ___ [2001 D.A.R. 4377], a
           case decided the day defendant filed his petition for rehearing in
15         this court.

16         People v. Cleveland, supra, ___ Cal.4th ___ [2001 D.A.R. 4377]
           clarified the appropriate standard for removing a juror.  The court
17         noted that case law permits "the removal of a juror who refuses to
           deliberate, on the theory that such a juror is 'unable to perform his
18         duty' within the meaning of . . . section 1089," but warned that
           "caution must be exercised in determining whether a juror has
19         refused to deliberate." (Id. at p. ___ [2001 D.A.R. at p. 4379.)  The
           trial court must balance the need to protect the sanctity of jury
20         deliberations with its duty to conduct a reasonable inquiry into
           allegations of misconduct.  (Id. at pp. ___ - ___ [2001 D.A.R. at
21         pp. 4379-4380].)

22         The court held: "The inquiry should focus upon the conduct of the
           jurors, rather than upon the content of the deliberations.
23         Additionally, the inquiry should cease once the court is satisfied
           that the juror at issue is participating in deliberations and has not
24         expressed an intention to disregard the court's instructions or
           otherwise committed misconduct, and that no other proper ground
25         for discharge exists . . . .

26   \\\\\

                                        24

"[P]roper grounds for removing a deliberating juror include refusal to deliberate.  A refusal to deliberate consists of a juror's unwillingness to engage in the deliberative process; that is, he or she will not participate in discussions with fellow jurors by listening to their views and by expressing his or her own views.  Examples of [sic] refusing to consider other points of view, refusing to speak to other jurors, and attempting to separate oneself physically from the remainder of the jury.  The circumstances that a juror does not deliberate well or relies upon faulty logic or analysis does not constitute a refusal to deliberate and is not a ground or [sic] discharge.  Similarly, the circumstance that a juror disagrees with the majority of the jury as to what the evidence shows, or how the law should be applied to the facts, or the manner in which deliberations should be conducted does not constitute a refusal to deliberate and is not a ground for discharge.  A juror who has participated in deliberations for a reasonable period of time may not be discharged for refusing to deliberate, simply because the juror expresses the belief that further discussion will not alter his or her views." (<u>People v. Cleveland</u>, <u>supra</u>, ___ Cal.4th at p. ___ [2001 D.A.R. at p. 4383].)

Applying these principles to the case before us, we conclude there was no error in removing Juror No. 11.  Defendant does not claim the trial court exceeded reasonable bounds in questioning the jurors.  The only issue before us is whether the responses to that inquiry evidence a failure to deliberate on the part of Juror No. 11.  Substantial evidence supports the trial court's decision to remove Juror No. 11.  Other jurors testified that Juror No. 11 did not approach deliberations with an open mind.  He referred to and relied on matters not in evidence, including the comparative abilities of the attorneys in the case.  He refused to answer jurors' questions.  His unwillingness to deliberate was reflected in his demeanor toward other jurors and the court.

Through careful questioning of all jurors, the court took great pains to assure itself that complaints about Juror No. 11 did not stem from a simple difference of opinion but from a refusal to deliberate.  While Juror No. 11 was certainly entitled to weigh Melissa's drug use in evaluating her credibility as a witness, the other jurors described Juror No. 11 as intractably biased against drug users, to the point that Juror No. 11 even denied having told the court that he could set aside his biases.

Actual bias, which would have supported a challenge for cause in voir dire, renders a juror "'unable to perform his duty'" and subject to discharge under section 1089.  (<u>People v. Keenan</u> (1988) 46 Cal.3d 478, 532; <u>see</u> <u>also</u> <u>U.S. v. Thomas</u> (2nd Cir. 1997) 116 F.3d 606, 616-617.)  The juror interviews revealed Juror No. 11 "had prejudged the credibility of [any drug user] who had testified at trial and was unable to case aside [his] personal bias in weighing the evidence." (<u>People v. Feagin</u>, <u>supra</u>, 34 Cal.App.4th at p.

1437.)

Jurors provided abundant evidence that [J]uror No. 11 was unresponsive, and was not willing to explain his position or otherwise deliberate.  The court noted it had observed the same behavior when questioning Juror No. 11.  The trial court was in a superior position to assess the juror's demeanor and determine his ability to continue deliberating.  (Perez v. Marshall (9th Cir. 1997) 119 F.3d 1422, 1427.)

There was no evidence that the court removed this juror because he rejected the prosecution's case.  To the contrary, the court's careful questioning of all jurors and its lengthy explanation for its action demonstrated legitimate reasons for the removal of Juror No. 11.

In claiming his removal was improper, defendant cites numerous cases, all of which are readily distinguishable.  For example, in U.S. v. Hernandez (2d Cir. 1988) 862 F.2d 17), the trial judge waited two days to see whether the jury would deadlock before discharging a questionable juror.  (Id. at pp. 20-22.)  Thereafter, the judge praised the remaining jurors for their efforts to persuade the holdout juror to convict the defendant.  (Id. at p. 24.)  The appellate court reversed because the dismissal of the holdout juror was motivated by the desire to avoid a mistrial, the removal was improperly delayed, and the court's statements to the remaining jurors prevented them from deliberating with an open mind.  (Id. at pp. 23-24.)  None of these factors are [sic] present here.

In U.S. v. Brown (D.C. Cir. 1987) 823 F.2d 591, a juror told the trial court that he was no longer able to deliberate because he had difficulties with both the statute involved in the case and the way the evidence had been presented.  (Id. at p. 594.)  The court dismissed the juror without questioning any other jurors.  (Id. at p. 595.)  The appellate court found this dismissal improper, because there was a possibility that the juror sought to be discharged because he disagreed with the other jurors' evaluation of the evidence.  (Id. at p. 596.)  Here, however, the trial court's inquiry of all the jurors demonstrated that Juror No. 11's discharge was based on his refusal to deliberate, not on his assessment of the prosecution's evidence.

In U.S. v. Thomas, supra, 116 F.3d at pages 623-624, the excused juror did not state he was unwilling to follow the court's instructions and instead assured the court that his vote was based on the evidence presented in court.  Other jurors corroborated that the discharged juror had justified his position in terms of the evidence.  The same cannot be said here.

In a supplemental letter brief, defendant directs our attention to United States v. Symington (9th Cir. 1999) 195 F.3d 1080, in which the court held that "if the record evidence discloses any

*reasonable* possibility that the impetus for a juror's dismissal stems from the juror's views on the merits of the case, the court must not dismiss the juror." (Id. at p. 1087, original italics.)  This standard is of no benefit to defendant in this case.  As the court's well-thought-out ruling makes clear, the decision to dismiss Juror No. 11 was unrelated to his views on the merits of the case.  The juror was dismissed because he failed to deliberate and perform his duties as a juror.  Substantial evidence supports that assessment, and we will not disturb the trial court's determination.  (People v. Cleveland, supra, ___ Cal.4th at p. ___ [2001 D.A.R. at p. 4379]; People v. Marshall, supra, 13 Cal.4th at p. 843.)

(Answer, Exs. E, F.)

### 4.  Applicable Law

Jurors have a duty to deliberate and must consult with one another to consider each other's views and to discuss the evidence with the objective of reaching a verdict. Lowenfeld v. Phelps, 484 U.S. 231, 235, 241 (1988); Allen v. United States, 164 U.S. 492 (1896).  "The very object of the jury system is to secure unanimity by a comparison of views, and by arguments among the jurors themselves."  Allen, 164 U.S. at 501.  If a juror fails or refuses to engage in the deliberative process, he may be removed whether or not he also questions the sufficiency of the prosecution's proof.  Perez v. Marshall, 119 F.3d 1422, 1427 (9th Cir. 1997).

As far as the undersigned can tell, there is no established standard set by the Supreme Court for determining the issues involved in dismissing a recalcitrant juror.  Although it is appropriate for lower courts to review appellate cases to determine if the Supreme Court would come to the same conclusion based on closely allied Supreme Court holdings, or in essence, has indirectly arrived at that conclusion as shown from the reasoning of the appellate court, it is not appropriate to simply adopt appellate court holdings as being the clearly established law set forth by the Supreme Court.  Rather one should examine the opinion to determine the extent to which the announced rule is the nearly inevitable ruling of the Supreme Court based upon the cited cases.  See Duhaime v. Ducharme, 200 F.3d 597, 598 (9th Cir. 1999).

Perez, a habeas case, utilized a "manifest error" test.  "Accordingly, we review for manifest error the trial court's determination that Robles was emotionally incapable of

continuing to deliberate." Id, 119 F.3d at 1426.  Moreover, under AEDPA, factual

determinations are to be upheld unless overcome by clear and convincing evidence.  However,

Perez did not directly announce the standards to which "manifest error" would be applied, i.e.,

was any possibility of dismissing the juror because of views on the case the appropriate standard,

or was manifest error connected to a probability that the juror was being dismissed because of

views on the case.  Nevertheless, Perez found that a previous habeas case, Miller v. Stagner, 757

F.2d 988, 995 (9th Cir. 1985) had determined that Cal. Penal Code § 1089, which permitted a

trial court to discharge a juror for simply "good cause" was a constitutionally sufficient standard.

Therefore, when Perez is reviewed as a whole, it is apparent that at least a  likelihood or

probability standard was being used.

United States v. Symington, 195 F.3d 1080 (9th Cir. 1999) set the standard for use

in federal criminal trials for dismissal of a jury, holding that if "the record evidence discloses any

*reasonable* possibility that the impetus for a juror's dismissal stems from the juror's views on the

merits of the case, the court must not dismiss the juror." Id. At 1087.  However, the Symington

court recognized that it was announcing this rule only for federal criminal cases and expressly

recognized the different context of a habeas case.  Symington, 195 F.3d at 1086 (n.3).

The later habeas case of Sanders v. Lemarque, 357 F.3d 943, 948 (9th Cir. 2004)

found that "[u]nder the circumstances presented here, the trial court committed constitutional

error when, after learning that the juror was unpersuaded by the government's case, it dismissed

the lone holdout juror."  Sanders utilized the AEDPA standards in determining that clear and

convincing evidence demonstrated that the trial court's determination of the facts in dismissing

the juror for alleged untruthfulness was in error.  However, Sanders did not comment upon the

actual standard to be employed, i.e., whether a "probability" that juror was being dismissed

because of views on the case must be found, or whether Symington's reasonable possibility

standard was all that a petitioner had to show.

\\\\\\

1        The California appellate court, in assessing the propriety of the dismissed Juror 11

2  in this case relied on the then recent <u>People v. Cleveland</u>, 25 Cal. 4th 466, 106 Cal. Rptr. 2d 313

3  (2001) decision.  Importantly, that decision expressly rejected the "any reasonable possibility that

4  the juror was excused because of his views on the case" standard of <u>Symington</u>, <u>Cleveland</u>, 25

5  Cal. 4th at 485, 106 Cal. Rptr. 2d 327, and held instead that "if it appears as a 'demonstrable

6  reality' that the juror is unable or unwilling to deliberate," the trial judge was authorized to

7  dismiss the juror.

8        Thus, the legal standard under review herein is not one of "reasonable possibility"

9  that the impetus for the juror's dismissal was the juror's views on the case.  The <u>Symington</u> court

10  did not cite Supreme Court authority for its test, and this court in habeas corpus is not authorized

11  to adopt it because the California test is not violative of established Supreme Court authority.

12  Rather, the California standard has been approved by <u>Miller</u>, and can only be reconciled with a

13  probability standard – that is, a juror will be erroneously dismissed if the dismissal is probably

14  based on the juror's views on the merits of the case as opposed to an inability to deliberate.[4]

15        In conclusion, petitioner will not be entitled to relief unless he can show that the

16  juror's dismissal in this case was probably a result of the juror's views on the case, and petitioner

17  must demonstrate by clear and convincing evidence that the facts determined by the state court

18  rejecting such a determination, i.e., finding that dismissal was warranted based on a refusal to

19  properly deliberate, are not entitled to the AEDPA presumption of correctness.

20  \\\\\

21  \\\\\

22

---

23    [4] The California standard focuses upon the appropriate reason for dismissal and the
federal test focuses upon the improper reason for dismissal.  However, one cannot logically read

24  California's test as requiring a verdict overturn based only on the possibility of an improper
reason for juror dismissal being present.  If there is a "demonstrable reality" of a proper reason,

25  the existence of a "reasonable possibility" of an improper reason would not require the verdict to
be overturned.  And, as pointed out above, The California standard could not be equated with the

26  "reasonable possibility" test since the state supreme court expressly rejected it.

5. <u>Analysis</u>

Petitioner argues that Juror No. 11 was improperly removed from the jury because he was unpersuaded by the government's case and refused to vote for a conviction.  He contends that Juror No. 11 was willing and able to deliberate but that he simply did not believe government witness Michelle Foote and was unpersuaded by the other jurors' arguments. Petitioner argues that the trial court's error in removing this juror because of his views of the merits of the case violated his federal constitutional rights pursuant to the Fifth, Sixth, and Fourteenth Amendments.

Petitioner first argues that the removal of Juror No. 11 violated his right to due process.  He contends that the California rule requiring the unanimous verdict of twelve jurors in a criminal trial "is the source of a liberty interest that is protected by the Due Process Clause of the Fourteenth Amendment."  (Second Am. Pet. at 15.)  This argument must fail in that it begs the real issue in any event.  As recited in the facts, petitioner was ultimately convicted by a unanimous jury.  While petitioner was not pleased with the composition of the jury which was unanimous, that issue is discussed below, the fact remains that he was convicted by a unanimous jury.  Although the federal issue involving replacement of a recalcitrant juror may be phrased in terms of a "unanimous jury" right, see United States v. Symington, 195 F.3d at 1087, however one semantically characterizes the category of rights involved, the real issue involves whether the replacement of a juror took place because the juror apparently did not agree with the prosecution case.

Turning to that issue, it is clear that when utilizing the appropriate standard of review, AEDPA will not permit a rejection of the trial court and appellate court's conclusions that Juror 11 had refused to deliberate as required, and hence the dismissal was not probably based upon the juror's expressed views on the case.

Numerous jurors informed the trial judge that Juror No. 11 refused to discuss his views, wanted to get off the jury, removed himself physically from the other jurors through use of

body language, did not have an open mind "from day one," responded to the other jurors' questions with evasive answers, and relied on evidence that had not been introduced at trial. Juror No. 5 informed the judge that Juror No. 11 was considering facts not in evidence such as the relative competence of the attorneys, contrary to the jury instructions, and that he flatly refused to deliberate. Juror No. 7 told the judge that Juror No. 11 implied he had been untruthful during voir dire when he agreed that he could set aside his biases when evaluating the credibility of witnesses. A number of the jurors' complaints were confirmed when the trial judge interviewed Juror No. 11 directly. The judge noted the juror's reluctance to answer questions, his off-putting body language, and his virtual refusal to agree to engage in further deliberations. In short, the record reveals a juror who was intransigent from the beginning and refused to engage in "meaningful" deliberations.

Petitioner focuses on other juror statements in an attempt to support his claim that Juror No. 11 was excused because of his views of the case and not because of a failure to deliberate. It is true that some of the jurors indicated Juror No. 11 believed insufficient credible evidence had been introduced to support a conviction, largely because he did not believe the prosecution's key witness due to her use of drugs. However, the trial judge made it clear that her decision to discharge Juror No. 11 was based on his unwillingness to participate in deliberations rather than his views on the merits of the case. She specifically explained that she conducted additional inquiry into the jury's problems in order to satisfy herself that the jurors were not trying to "oust (Juror 11) based on his viewpoint." (RT at 2515.) She concluded that their motivation was "the contrary." (Id.) The record reflects that the trial judge's decision was based on her finding, from the information provided by the other jurors, that Juror No. 11 simply refused to deliberate in a meaningful manner. Although it was clear to the defense that Juror 11 was a holdout juror against the prosecution (defense counsel was striving mightily to retain Juror 11), was clear to the prosecution that Juror 11 did not favor the prosecution's case (the prosecutor was attempting to have the court dismiss Juror 11), and was probably obvious as well

31

1   to the trial judge that Juror 11 was most likely a lone holdout juror, the mere fact that Juror 11

2   was a lone holdout (assuming the obvious) does not require the verdict to be overturned.

3   Petitioner has failed to rebut the presumption of correctness accorded this finding by clear and

4   convincing evidence.  28 U.S.C. § 2254(e).[5]

5              Finally, petitioner argues that the trial judge's decision to discharge Juror No. 11

6   violated his right to have his trial completed "by the same tribunal in which it was begun."  This

7   is simply a reiteration of the overarching issue concerning when a trial judge may dismiss a juror.

8   (Second Am. Pet. at 16.)  Criminal defendants have a constitutional right to have the jury first

9   impaneled reach a verdict.  Wade v. Hunter, 336 U.S. 684, 689 (1949).  However, this right is not

10  absolute and "must in some instances be subordinated to the public's interest in fair trials

11  designed to end in just judgments."  Id.  See also United States v. Bates, 917 F.2d 388, 392 (9th

12  Cir. 1990); Peek v. Kemp, 784 F.2d 1479, 1483-84 (11th Cir. 1986) (dismissal of juror who was

13  unable to deliberate did not violate defendant's right to have his trial completed by a particular

14  tribunal; to a fair, impartial and representative jury; or to due process).  That was the case here.

15  The trial judge attempted to preserve the originally empaneled jury by sending the jurors back to

16  deliberate after receiving the first jury note.  She also suggested ways for the jurors to move

17  beyond the impasse.  The judge excused Juror No. 11 only after a very careful and thorough

18  interview of all jurors which revealed that deliberations had been impossible from the beginning.

19  Under these circumstances, petitioner's right to have his trial completed by his original jury was

20  not violated.

21             The state court's decision with respect to petitioner's claim is based on a

22  reasonable interpretation of the facts of this case and is not an unreasonable application of United

23  States Supreme Court authority.  By dismissing Juror No. 11 after finding that he was unwilling

24

25  ⁵  The Sanders decision, cited by petitioner in support of his claim, does not compel a
    contrary conclusion.  In Sanders, the trial court's basis for removing a holdout juror –
    untruthfulness during voir dire – was an "objectively unreasonable determination of the relevant
26  facts.'  357 F.3d at 948.  That is not the case here.

1  to deliberate and follow instructions, the trial court did not violate petitioner's right to a jury

2  composed of "jurors who will conscientiously apply the law and find the facts."  <u>Lockhart v.</u>

3  <u>McCree</u>, 476 U.S. 162, 178 (1986).

4        Accordingly, IT IS HEREBY RECOMMENDED that petitioner's application for

5  a writ of habeas corpus be denied.

6        These findings and recommendations are submitted to the United States District

7  Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within twenty

8  days after being served with these findings and recommendations, any party may file written

9  objections with the court and serve a copy on all parties.  Such a document should be captioned

10  "Objections to Magistrate Judge's Findings and Recommendations."  Any reply to the objections

11  shall be served and filed within ten days after service of the objections.  The parties are advised

12  that failure to file objections within the specified time may waive the right to appeal the District

13  Court's order.  <u>Martinez v. Ylst</u>, 951 F.2d 1153 (9th Cir. 1991).

14  DATED: 1/12/06

15

16        /s/ Gregory G. Hollows

17        _____
          GREGORY G. HOLLOWS
          UNITED STATES MAGISTRATE JUDGE

18  ggh:8
    Murphy1046.157

19

20

21

22

23

24

25

26